**ALFRED DUNHILL OF LONDON, INC., and Alfred Dunhill, Ltd., Plaintiffs,**

v.

**DUNHILL TAILORED CLOTHES, INC., Defendant.**

No. 78 Civ. 4390 (PNL).

United States District Court, S. D. New York.

April 13, 1981.

Albert Robin, and Morris Shilensky, New York City, of counsel, for plaintiffs.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant; David Goldberg, and Lynn Fruchter, Esq., New York City of counsel.

OPINION AND ORDER

LEVAL, District Judge.

Plaintiff brings this action under the trademark laws of the United States, seeking to enjoin defendant from franchising or licensing of the "Dunhill Tailors" name.

Plaintiff Alfred Dunhill of London, Inc. ("U.S. Dunhill"), a Delaware corporation with its principal place of business in New York, is a wholly owned subsidiary of plaintiff Alfred Dunhill Limited ("British Dunhill"). U.S. Dunhill is the exclusive user of the trade name and trademark "Dunhill" in the United States; British Dunhill is the owner of the trade name and trademark "Dunhill" elsewhere in the world.

U.S. Dunhill retails "Dunhill" products from eight stores in the United States[1] and to mail order customers throughout the United States. U.S. Dunhill also wholesales such products throughout the United States; British Dunhill and other related corporations retail and wholesale such products throughout the rest of the world.

The products sold by U.S. Dunhill include smoking articles, jewelry, small leather goods, luggage, toiletries, bar goods and accessories, writing instruments, desk accessories, clocks and menswear. "Menswear" includes shirts, sweaters, ties, robes, hats, outerwear, and slippers, all sold under the "Dunhill" name.

For the purposes of this litigation, U.S. Dunhill and British Dunhill will be referred to jointly as "plaintiff."

Defendant Dunhill Tailored Clothes, Inc., manufactures menswear, including clothing, accessories, ties, shirts, undershorts, socks, and footwear. It retails these items under its label at its New York store and sells its goods to mail order customers, through catalogs and advertisements in national publications. It wholesales goods to other retailers in the United States to be resold under defendant's trademark.

There is a long history of prior trademark litigation between these parties. In 1957, plaintiff brought an action to enjoin defendant from using the trademarks "Dunhill," "Dunhill Tailors," or "Dunhill Tailored Clothes, Inc." on any of its products. A seven-day trial was held before Judge Edward J. Dimock of this court, in which both parties presented considerable evidence on the merchandise each sold, the manner of sale, and the prior relationship between them. The evidence showed that defendant had sold its goods under the Dunhill name from its first store on Fifth Avenue in New York from 1923 until 1927, and had conducted a retail and small wholesale business from its second store on West 32nd Street in New York from 1927 to 1933. The defendant had advertised in national publications and on national radio broadcasts; its activities included the manufacture of suits for sale through the John Wanamaker Store in New York; the operation of leased departments[2] for the sale of custom-made clothes in Macy's department store in New York City and Bamberger's department store in Newark, N.J.; and defendant's goods were advertised and sold at the Hattie Carnegie Men's Shop in Palm Beach, Florida. All of these sales and activities were conducted under the "Dunhill" label. There was also testimony concerning a discussion between representatives of plaintiff and defendant regarding the establishment by defendant of a Dunhill Tailors department within plaintiff's store in Beverly Hills, Calif.

Judge Dimock found that defendant's use of the name and mark "Dunhill" was an infringement of plaintiff's mark and constituted unfair competition. On the other hand, Judge Dimock found that acts and conduct of representatives of plaintiff amounted to "an implied assurance by plaintiff to defendant that defendant might

---

1. The stores are located in New York, Chicago, Beverly Hills, San Francisco, Dallas, Houston, Atlanta, and Washington, D.C. Plaintiff also maintains retail departments in Bloomingdale's in New York and in Macy's in San Francisco.

2. In a "leased department," defendant had its own personnel, sold its clothing, and paid a percentage of the sales for rent. The department was identified with a large sign as "Dunhill Tailors".

continue the sale [of certain products] under the name ... 'Dunhill Tailors'." Judge Dimock's ruling permanently enjoined defendant from the use of the mark "Dunhill," but authorized the defendant to

"... use the words "'Dunhill Tailors' on or in connection with the advertising, offering for sale and sale, including use in its corporate title, of the following products for men, as such products are defined in the Findings of Fact filed herein, namely, clothing, jewelry, toiletries, haberdashery, flat leather goods, luggage and silent valets;

"Provided, however, that when defendant so makes any use of 'Dunhill Tailors,' the words 'Tailors' shall always be horizontally juxtaposed to 'Dunhill' and shall always be in the same form, font, style, size and color and as prominent as 'Dunhill,' and provided further that defendant shall not use 'Dunhill Tailors' in lower case type."

The ruling expressed no limitation on the manner of defendant's distribution of its goods, or on the geographic area in which defendant might use the mark "Dunhill Tailors".

After the 1958 litigation, defendant obtained, after contested proceedings, two federal registrations for its "Dunhill Tailors" trademark. Each of these provides for use of the mark "Dunhill Tailors" on terms consistent with Judge Dimock's order. By agreement dated December 4, 1967, the parties settled a dispute concerning trademark rights. Neither the registrations nor the settlement agreement contains any limitation as to the manner or the geographic area in which defendant's goods may be sold.

In 1970, plaintiff again brought suit to prevent defendant from wholesaling men's clothing, toiletries, or other products. This litigation was concluded by a settlement agreement dated January 11, 1972, which set out a list of products that defendant was permitted to wholesale under the "Dunhill Tailors" trademark.[3] Again, there was no mention of a geographic limit.

On September 6, 1978, a newspaper article appeared stating that defendant was negotiating to open its first franchise unit on Connecticut Avenue in Washington, D.C., and was hoping to open stores in Beverly Hills, San Francisco, and Chicago. On September 19, plaintiff commenced this lawsuit. It now appears that the newspaper article was not entirely accurate, but that defendant was indeed negotiating a franchise or license with a third party for the operation of a store to retail "Dunhill Tailors" merchandise in Washington, D.C., or Chevy Chase, Maryland; these negotiations were broken off, and to date defendant has not entered into any licensing or franchising agreements.

At trial, Leon Block, president of the defendant corporation, testified that defendant had conducted a wholesale business since the late 1920s, which was discontinued in approximately 1932 and resumed in the late 1940s or early 1950s. Defendant distributed three mail-order catalogs, in approximately 1957 to 1960, throughout the United States, largely outside New York City, and one catalog as an insert in the New York Times, in addition to its advertisements in national publications. Some of defendant's wholesale customers have at times had separate departments in their stores dedicated to "Dunhill Tailors" clothing. Also, over the years defendant's garments were sold with "combination labels," which contain both the "Dunhill Tailors"

---

**3.** The agreement provides

"1. Dunhill Tailors may, under the DUNHILL TAILORS trademark and under its corporate name, engage in the wholesaling of, and advertise, offer for sale and sell at wholesale, men's clothing, namely, suits, dress suits, topcoats, overcoats, outer wear coats, sport jackets, raincoats and rainsuits and men's haberdashery, namely, beach footwear and all slipper types which are not sold in different widths,

dress shirts, gloves, neckties, sport shirts, sweaters, slippers, swim trunks, scarves and mufflers, robes and underclothes.

2. Dunhill Tailors may not, under the DUNHILL TAILORS trademark or under its corporate name, engage in the wholesaling of, or advertise, offer for sale or sell at wholesale, men's toiletries, jewelry or leather goods or any other product other than those specifically referred to in paragraph 1."

name and the name of the retail store, preceded by "Made exclusively' for...." Defendant's garments have been sold under such labels in stores in Southampton; Philadelphia; Pittsburgh; Beverly Hills; Hartford; New Haven; and Dayton; some of these stores sold defendant's goods in a separate "Dunhill Tailors" department.

In the 1960s, defendant maintained a store of its own in Palm Beach, Florida.

Judge Dimock's 1958 order did not explicitly authorize or forbid the defendant from franchising its label. Plaintiff contends that the order should be construed to forbid all conduct which it did not specifically authorize; defendant contends it should be construed to authorize whatever it did not forbid.

If the proof before Judge Dimock had been of an operation no broader than a retail tailor shop in New York City, I might find persuasive force in plaintiff's argument. Under those circumstances, I might find that franchising in other cities went so far beyond the activities before Judge Dimock that the injunction of such activities should be seen as implicit in the injunction granted.

But that was not the case. There was testimony before Judge Dimock that back in the 1950s defendant was doing a fair volume of business in markets other than New York. There were advertisements in national publications and on national radio; defendant was maintaining leased departments in various department stores. The evidence showed that defendant was actively engaged in advertising and marketing its clothes under the "Dunhill" label in a number of cities throughout the country. Based on the evidence in the 1958 trial, I find that Judge Dimock had before him the issue of defendant's geographic distribution of the "Dunhill" name. I cannot assume that his failure to impose a geographic limitation was anything but deliberate, and I must conclude that there was no intention on Judge Dimock's part to limit the defendant to the New York area or its New York store in its marketing under the "Dunhill Tailors" name.

The issue remains whether franchising or licensing is so different from the defendant's operations as considered by Judge Dimock that his order should be interpreted as a bar to such activity. Plaintiff argues that franchising is fundamentally different and would expose plaintiff to a much more serious risk, because defendant would no longer have direct control over the manner in which its name is used by a franchise. I do not find this argument persuasive. Franchise agreements can and often do permit the franchisor to require maintenance of standards on the part of the franchisee. Defendant would be capable of exercising at least as much control through a franchise agreement as it has over the years in selling to retailers who sold "Dunhill Tailors" garments in their own shops. I do not find that franchising presents a significantly greater threat to plaintiff's good name than do the types of activities that were before Judge Dimock. Furthermore, since the time of Judge Dimock's order, defendant appears to have built up its business and its name in the same way as has plaintiff—by marketing high quality merchandise in a tasteful manner to a moneyed clientele—and plaintiff has not contended otherwise. There is no reason to believe defendant would depart from that standard in a way that might bring an altered image or disfavor to the "Dunhill" name. If in the future defendant permits operation of a franchise in a manner that does threaten to tarnish the "Dunhill" name, plaintiff can bring action based on that conduct. However, there is nothing inherent in a franchise, in contrast to defendant's previous methods of operation, that places defendant beyond the scope of Judge Dimock's order or subjects the plaintiff to unreasonable risk beyond the compromises which Judge Dimock found appropriate.

The injunction sought by plaintiff is denied.[4]

4. Plaintiff argues that defendant violated the 1972 wholesaling agreement by selling slacks.

Omission of slacks from the definition of "men's clothing" seems to be an oversight, and

plaintiff offers neither a logical explanation for a definition that does not include it, nor suggestion how plaintiff is prejudiced by defendant's sale of slacks in addition to numerous other categories of men's clothing permissibly sold. Nonetheless, since the agreement explicitly bars defendant from using the Dunhill name on any product "other than those specifically re-

ferred to," the sale of "Dunhill Tailors" slacks may constitute a breach of the 1972 agreement. That is a question I am not called upon to decide in this litigation which seeks only injunctive relief. Assuming for argument that sale of slacks constitutes a breach of the contract, no showing has been made that this breach entitles plaintiff to injunctive relief.